Comunidad Religiosa Católica de Reverendas Madres Carmelitas Calzadas, Inc., of San Juan, Puerto Rico, Plaintiff and Appellee, v. Ramón Fernández Pérez, Defendant and Appellant, and his wife, Ana María Caballo, Defendant.

No. 8498.   Argued July 23, 1942.—Decided November 30, 1942.

*Angel A. Vázquez* for appellant. *José Benet* for appellee.

Mr. Justice Snyder delivered the opinion of the court.

The plaintiff in this case sued for (a) a declaration of nullity of the cancellation by the registrar of property of a *censo* encumbering certain real property; (b) reinscription in the registry of the *censo* in question; and (c) collection of the *réditos* which had been unpaid since the date of the cancellation of the *censo*. The district court rendered judgment in favor of the plaintiff as to (a) and (c), and a defendant has appealed.

The lower court correctly stated the facts, as follows:

"In the old books of the *Anotaduría* of Mortgages under the charge of the Registrar of Property of San Juan, there appears an entry reading as follows:

" 'City—Censo—675—Manl. Ayala, as principal (pral.) : Domingo Andino, Tomás Dapena, and María de los Reyes Caveza, his wife, as sureties, all residents of this city (*vecind°.*), by (*pr.*) a deed (*escrita.*) executed (*otorga.*) before Don Francisco (*Franco.*) de Acosta Cuño, Rl. pp.co. (royal and public notary—*escribano*—) on the fifth of the present (*preste.*) month and year, constitute and bind themselves for a *censo* for the principal sum of six hundred and seventy-five pesos, as a rent charge (*de. Cappnia.*), belonging to the Convent of the Mother Nuns of this capital; it being the same under which Francisco de los Ríos was bound; and the *réditos* which must begin to run from January first; and to secure the principal sum he mortgaged a ONE-STORY HOUSE, LOCATED IN SAN SEBASTIÁN STREET, built of stone and with a flat roof adjacent to that of Bruno Muñoz and Doña Juana de Silva, on which there is another charge constituted by Hilario de Lara for ONE HUNDRED AND TWENTY-FIVE PESOS. Puerto Rico, this 9th day of March, one thousand eight hundred and thirteen, A.D. (Sgd.) Franco. de Acosta.'

"This entry was transferred to the modern registry on July 16, 1895, becoming the third inscription of property No. 1486, that is, the house located at 80 San Sebastián Street.

"The first inscription of property No. 1486, made on November 5, 1894, involving the sale of the property to Doña Elvira Capetillo, describes the encumbrance in question as follows:

" 'This property is subject . . . to a *censo* for six hundred and seventy-five pesos in favor of the Convent of the Mother Nuns of this Capital, recorded at page 122, number 351, Fifth Book (old), and also acknowledged in the title on which this inscription is based.'

"In the fourth and sixth inscriptions, involving sales of the property, the existence of the encumbrance was acknowledged.

"In the ninth inscription the registrar appears cancelling, at the request of the owner of the property, Doña Mercedes Valldejuli, 'the mortgages for one hundred and twenty-five pesos and six hundred and seventy-five pesos, constituted to secure the *censos* in favor of Archdeacon Juan Lorenzo de Matos and of the Convent of the Mother Carmelite Nuns, respectively . . .' as more than twenty years had elapsed 'since the date of its inscription.'

"Shortly thereafter, on October 27, 1934, Mercedes Valldejuli sold the property to the defendant.

"Up to and including the year 1931, Doña Mercedes Valldejuli, through her representatives, paid the plaintiff the annuity pertaining to the *censo* for 675 pesos. The annuities corresponding to the years from 1932 to 1938, inclusive, have not been paid."

None of the other inscriptions in the chain of title, which the trial judge fails to mention in his statement of the facts, has any relation to the *censo* or to the respective conveyances transferring the property in question.

■ We consider first the contention of the appellant that the appellee has no legal capacity to sue. In support of his position, the appellant argues (*a*) that there was no sufficient showing that the appellee is, as alleged, the "successor and *continuadora*" of the Convento de Madres Carmelitas de San Juan, in the name of which the *censo* was originally constituted, and (*b*) that a suit of this nature must be brought by the Bishop of Puerto Rico.

The argument as to (*a*) is not so much an attack on the appellee's capacity to sue—in view of the introduction in evidence without objection of a certified copy of the articles of incorporation of the appellee—as a contention that the appellee has not made out its case in the suit herein. We need not stop to determine if, as contended by the appellant, the certified copy of an article of appellee's articles of incorporation, reciting that it is the "successor and *continuadora*" of the Convento de Madres Carmelitas de San Juan, is inadmissible as self-serving evidence. This becomes unnecessary, in view of the deposition of Padre Aurelio Marrero that the two religions orders are the same, and that there has never been any other religious order of the same name in Puerto Rico. While this evidence was perhaps not the best evidence to establish the appellee as successor, it was not inadmissible, and in view of the lack of any offer by the appellant of any testimony to the contrary, the district court was warranted in finding that "the said deposi-

tion is sufficient to identify the plaintiff with the Convent of Mother Carmelite Nuns.''

■ As this is not a controversy between the Church and the People of Puerto Rico, the Joint Resolution of September 16, 1908, Laws of Puerto Rico, 1909, p. 106, cited by appellant, has no bearing on this case. The contention that only the Bishop of Puerto Rico could bring the suit herein is without substance, as the appellee, since its incorporation, has a juridical status which clearly includes a right to sue.

■ Other alleged errors assigned by the appellant are adequately disposed of in the able opinion of the trial judge, which reads in part as follows:

"The property of defendant, 80 San Sebastián Street, is the one property subject to the encumbrance which appears from the third inscription thereof. It is true that the deed whereby the encumbrance was constituted was not presented in evidence. But that circumstance lacks importance if it is borne in mind that the deed was executed over a century ago, and that the old books of the *Anotaduría,* as well as the modern registry, show in an official and authentic form that the deed was executed.

"The defendant, however, argues that there is no proof that the property encumbered in accordance with the terms of the deed is precisely 80 San Sebastián Street. We think that the evidence to that effect is overwhelming. It is true that in the original entry in the old *Anotaduría* no mention is made of the number of the house on San Sebastián Street, and that the adjoining owners to whom said entry refers do not appear as adjoining owners in respect to house No. 80 in the modern Registry. It would be strange, indeed, that those who were adjoining owners in the year 1813 should continue to be such a century afterwards, and the evidence for the plaintiff would be suspicious if it had sought to establish that fact. The circumstance that the house today bears No. 80, and that the entry made in 1813 failed to mention the number of the house is also without importance. What is important and, in the absence of evidence to the contrary, serves to definitely establish the identity of the house encumbered in 1813 with the one which today bears No. 80 on San Sebastián Stret, is the fact that, before the entry made in 1813 had been transferred to the new books, and upon the execution of the deed which gave rise to the first inscription

of house No. 80, the defendant's predecessors in interest had acknowledged in a clear and definite form that that was precisely the property subject to the encumbrance constituted in the year 1813.

"The defendant maintains that there is no evidence that those that constituted the encumbrance in 1813 were owners at that time of the encumbered property. It is true that the only evidence existing on this point is the fact that those persons did constitute the encumbrance. That facts suffices to raise the rebuttable presumption that they were the owners (see §464 of the Code of Civil Procedure, 1933 ed., particularly the original English text of subdivisions 8, 12, 19, and 20), but in addition there is the admission made by defendant's predecessors in interest, in a public instrument (the deed which gave rise to the first inscription of house No. 80), as to the validity and existence of the encumbrance. As against that presumption and that admission, the defendant has failed to introduce any evidence, except certificates showing that the persons who in the year 1813 constituted the encumbrance in question do not appear in the NEW books as owners of house No. 80. But it is not the purpose of the new books to tell us who were the owners of property in Puerto Rico in 1813, and therefore the said certificates lack probative value in this case.

"*Marrero* v. *Skerret et al.*, 17 P.R.R. 540, cited by the defendant, in which the evidence as to the existence of a *censo* was held to be insufficient, has no application here. The only evidence that was presented there, according to the Supreme Court, was an opinion or conclusion of the registrar of property to the effect that a certain property was subject to a certain *censo*. No literal copy of the entry made in the old books nor of the inscription containing the transfer of said entry to the new books was introduced in evidence, as was done in the instant case. Nor was there an admission, as in this case, made by the predecessors in interest of the defendant WHILE THEY WERE OWNERS OF THE ENCUMBERED PROPERTY. In the *Skerret* case, *supra*, the statement (and not the admission) of the predecessors in interest of the defendants was made after the former had already disposed of the property alleged to be encumbered.

"The defendant further maintains that the original entry setting forth the encumbrance alleged in the complaint, as well as the transfer thereof to the new books, is null and void. The entry is attacked as insufficient in accordance with our Civil Code. Our Civil Code was not in force in 1813. The transfer is challenged because the

same was not made at the request of an interested party, and because the registrar made it erroneously and negligently. There is nothing in the evidence to show that the registrar committed any error. It appears that the transfer was made at the request of Manuel Díaz Canejas, General Collector of Vacant (ecclesiastical) Estates. There is no evidence to show that he was not the person authorized to act on behalf of the Carmelite Nuns. In the absence of evidence to the contrary, we must presume that Díaz Canejas duly established his authority before the registrar (see subdivision 15, §464 of the Code of Civil Procedure, 1933 ed.).''

█ Although the lower court did not discuss in its opinion the contention of the appellant that the original entry in the old *Anotaduría* was a nullity because it was recorded by the same person, as registrar, before whom the document was executed as notary, our attention has not been called to any statute which in 1913 made a recordation under such circumstances void.

█ Another assigned error involves the question of whether, in the words of the district court "the cancellation of . . . inscription in the new books, made by the Registrar at the request of the predecessor in interest of the defendant, without the intervention of the plaintiff, was valid." We adopt the language of the trial judge on this point, reading in part as follows:

"The registrar thought he was authorized to make such cancellation on the basis of the section of Act No. 12 of August 29, 1923 which provides that any owner of real property 'encumbered by mortgage liens overdue for twenty (20) years or constituted for that time if they have no term' may, on the lapse of one year from the effective date of the act, obtain from the registrar the cancellation of the mortgage.

"The registrar assumed that he was cancelling a mortgage. Let us see whether what he sought to cancel was a mortgage or a *censo*.

"The Registrar of Property of San Juan, in a certificate introduced in evidence by the defendant, tells us that in the old *Anotaduría* there appear entries showing the existence of a *censo* for 675 pesos in favor of the Mother Nuns, constituted upon a house situated

in Cruz Street, and that these entries were CANCELED, as another CENSO had been constituted upon the house in San Sebastián Street (the property of the defendant), as we have seen. The reg ;trar goes on to transcribe literally the entry of the latter *censo* (*supra*). It clearly appears from that entry that the constitution of a *censo* is involved. In the entry there is only one word which might be considered as inconsistent with a *censo* and consistent with a mortgage, and it occurs in the following phrase: 'and to secure the principal sum he MORTGAGED a one-story house'.

"In other words, the entry tells us that the owner of the house constituted a *censo*, and to secure the principal of the *censo* he 'MORTGAGED' the house. If instead of using the word 'MORTGAGED', the term 'encumbered' had been used, there would not be the slightest doubt that the entry refers to a *censo* and not to a mortgage. But in the year 1813, when the entry was made, and for many years prior and subsequent thereto, the use of the verb 'mortgage' as synonymous with 'encumber', or 'subject to a *censo*' or '*acensuar*', was frequent.

"Thus we see that, in 1705, Philip V, in a decree of Febr1ary 12, stated :

"' . . . and that many annuitants (*acreedores censualistas*) acknowledging a greater benefit to them from keeping their debtor in possession and management of the property than in admitting the voluntary relinquishment of the mortgages, have reduced the *réditos* of the *censos* . . .' (Book X, Title IV, Law VIII, *Novísima Recopilación*.)

"And on July 11, 1761, Charles III in a decree stated :

"'I have granted to the owners of estates tail (*mayorazgos*), to the Patrons and Managers of houses which belong to charitable establishments subject to Royal jurisdiction, and to the gua rdians and curators of minors my Royal permission and the power to constitute *censos* thereon, the principal sums of which do not exceed the necessary amount for paying the cost of the work required for cleaning Madrid, unless it be for redeeming other *censos* previously constituted on said houses, at three per cent and reducing the rate to two and a half per cent or less, AND TO MORTGAGE FOR THE PAYMENT OF THE *réditos* THEREOF, and as security for the principal sums received, the same things and other properties belonging to said estates or charitable establishments . . .' (*Novísima Recopilación, Book X, Title XV, Law XI.*)

"Fifteen years before the making of the entry which we are now discussing, Charles IV in his Royal Order of December 18, 1798, stated:

" '. . . that the perpetual or emphyteutic *censos* charged on property in favor of private persons, ecclesiastical bodies, or charitable endowments shall pass with the property securing the same (*sirven de hipoteca*) . . .' (*Novísima Recopilación*, Book X, Title XV, Law XX.)

"Escriche (*Diccionario Razonado de Legislación y Jurisprudencia*, p. 441) writes:

" 'According to some, the thing charged with a *censo* has the character of a MORTGAGE; but even though generally it is thus designated, as the rules governing the other mortgages are not applicable to it, the view of those who consider the burden of the *censo* as an easement charged on the things seems more acceptable.'

"Commentator León Bonel y Sánchez, referring to the consignative *censo*, in volume 4, p. 609, of his commentaries, says:

" 'Whereby the ownership of the thing the object of the contract is not transferred nor divided, but a sum of money is made a charge on the same with the obligation to deliver to the annuitant a pension which burdens the property on which the principal sum was charged (it is therefore in the nature of an annuity mortgage) . . .'

"Hence, it is not surprising that the person in charge of the old books in San Juan, in 1813, did not hesitate to entitle the entry as '*censo*', nor that the Registrar of Property of San Juan in the certificate which he issued on January 5, 1940 (defendant's Exhibit 2) at the request of the defendant, characterized as a *censo* the right or encumbrance appearing from the entry, nor that in the first inscription of the property of the defendant and in the deed of sale giving rise to said inscription, the parties and the Registrar should have designated as a *censo* the right or encumbrance in question.

"It was not until January 8, 1934, that somebody conceived the possibility of seizing upon the word 'mortgaged' found in the entry, in order to suggest that a mortgage was involved and to obtain, as he did obtain on the following day, the *ex parte* cancellation of a legitimate right of the plaintiff, for which there was not the slightest justification, either on the face of the Registry or on actual facts.

"The registrar was absolutely without power to cancel the inscription of the plaintiff's right. As we have seen, not a mortgage, but a *censo* was involved, and neither Act No. 12 of August 29, 1923,

nor Act No. 12 of June 25, 1924, authorizes the cancellation of the record of a *censo*.  *Chiqués* v. *Registrar of Caguas*, 34 P.R.R. 567.''

''The defendant argues, with not much vigor, that there is not involved the record, but only the MENTION, of a *censo*. That is not so. The original entry was the equivalent, under the old system, of a record under our Mortgage Law, and its transfer to the new books was made as an inscription, namely, the third inscription of the defendant's property. . . . .

''Since the registrar made an unauthorized cancellation, the ninth inscription of the property of the defendants is void in so far as said inscription purports to cancel plaintiff's *censo* which appears recorded in the third inscription. See §33 of the Mortgage Law. . . . .''

■ Appellant claims to be a third person (*tercero*) on the ground that he acquired the property herein subsequent to the cancellation of the *censo*. But the reasons for the nullity of the cancellation of the *censo* appear from the registry records themselves, and as the court said in *Ochoa* v. *Hernández*, 230 U. S. 139, 164:

''It is a familiar doctrine, universally recognized where laws are in force for the registry or recording of instruments of conveyance, that every purchaser takes his title subject to any defects and infirmities that may be ascertained by reference to his chain of title as spread forth upon the public records. (Citing cases.)

''This principle is recognized in Articles 34 and 37 of the Mortgage Law. In referring to 'reasons which do not clearly appear from the registry,' and 'causes plainly expressed in the registry,' they refer of course to matters of fact, not to matters of law. In other words, if the registry gives notice of a state of facts that renders the title invalid or subject to question in law, the purchaser who relies upon the record takes his title subject to whatever consequences may flow in law from the facts thus notified.''

See 2 Morell, *Comentarios a la Legislación Hipotecaria,* 617, 619, 620; *Anaud* v. *Martínez et al.,* 40 P.R.R. 641, 647; *Cabo Rodríguez* v. *Anaud,* 54 Fed. (2) 585, 587; *Ayala* v. *Flores,* 50 P.R.R. 832, 839.

Appellant contends that the alleged cause of action herein has prescribed, under §37 of the Mortgage Law, because

more than a year has elapsed since the date of the cancellation. That section, providing for rescissory and resolutory actions, does not apply to this case.

The judgment of the district court will be affirmed.

Mr. Justice Todd, Jr., did not participate herein.